**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| INNOVATIVE DISPLAY TECHNOLOGIES LLC, | ) ) ) | Civil Action No. 2:13-cv-522-JRG (CONSOLIDATED - Lead Case) |
| Plaintiff, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| ACER INC. AND ACER AMERICA CORP. et al. | ) ) ) | |
| Defendants. | ) ) ) | |

---

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

---

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ..................................................................................................1

II.     THE PROPER CONSTRUCTION OF DISPUTED CLAIM TERMS .............................2

        A.      "pattern of deformities" ('547 patent, claim 1; '660 patent, claims 1, 33)
                / "pattern of light extracting deformities" ('974 patent, claims 1, 7, 13;
                '370 patent, claims 1, 13, 29, 47; '816 patent, claim 1)............................2

        B.      "continuous side walls" ('177 patent, claims 1, 15) ..................................5

        C.      "transition region" ('660 patent, claims 1, 3, 10, and 33; '370 patent
                claims 13 and 47)........................................................................8

        D.      "at least some of the light extracting deformities on or in one of the sides
                are of a different type than the light extracting deformities on or in the
                other side of the panel member" ('370 patent, claims 1, 13)................11

        E.      "an air gap therebetween" ('547 patent, claim 1) / "an air gap between
                the film, sheet, plate or substrate and the panel member" ('194 patent,
                claim 1) .....................................................................................13

        F.      "desired light output distribution" ('547 patent, claim 1) / "desired light
                output distribution or effect" ('194 patent, claim 23) / "desired light
                output color or uniformity" ('177 patent, claim 15) / "desired light
                output" ('547 patent, claim 1; '194 patent, claim 23; '177 patent, claim
                15) ............................................................................................16

        G.      "predetermined" ('370 patent, claims 1, 13, 29, 47; '660 patent, claims 1,
                33; '177 patent, claim 1) ..............................................................18

        H.      "posts, tabs, or other structural features that provide a mount" ('974
                patent, claim 1, 7)........................................................................19

III.    THE ASSERTED CLAIMS OF THE '547, '194, '177 AND '370 PATENTS
        ARE INDEFINITE AND INVALID ..........................................................................19

        A.      The Definiteness Requirement.......................................................19

                1.      The Legal Standard for Indefiniteness......................................19

                2.      Terms of Degree are Indefinite if the Specification is Deficient ...............20

                3.      Expert Testimony Cannot Supply a Missing Specification
                        Disclosure ..................................................................22

        B.      Indefinite Terms..........................................................................22

    1.    "well defined optical elements or deformities" ('194 patent claims 1, 16, 31) / "optical elements or deformities of well defined shape" ('194 patent, claim 28) ......................................................22

    2.    "a pattern of deformities on one side of the sheet or film having a width and length that is quite small in relation to the width and length of the sheet or film" ('547 patent, claim 1) ...................................24

    3.    "pass through a liquid crystal display with low loss" ('194 patent, claims 1, 16, 28; '370 patent, claims 1, 29; '547 patent, claim 1) .............26

    4.    "to suit a particular application" ('194 patent, claim 31) / "to fit a particular application" ('177 patent, claims 1, 15; '974 patent, claim 5) ...................................................................................................28

IV.    CONCLUSION ...........................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Display Technologies of Texas, LLC v. AU Optronics Corp.*,
    No. 6:11-cv-00391-LED (E.D. Tex.) 2012 WL 2872121 (E.D. Tex. July 12, 2012)...... passim

*AFG Industries, Inc. v. Cardinal IG Co., Inc.*,
    239 F.3d 1239 (Fed. Cir. 2001)............................................................................24

*Bicon, Inc. v. Staumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006)..............................................................................23

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005)..................................................................... passim

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
    412 F.3d 1291 (Fed. Cir. 2005)............................................................................22

*DSW, Inc. v. Shoe Pavilion, Inc.*,
    537 F.3d 1342 (Fed. Cir. 2008)............................................................................29

*Endo Pharmaceuticals Inc. v. Watson Labs., Inc.*,
    No. 2:13-cv-192, 2014 U.S. Dist. LEXIS 84804 (E.D. Tex. June 23, 2014) .............21, 24, 27

*Frans Nooren Afdichtingssystemen B.V. v. Stopaq Amcorr, Inc.*,
    744 F.3d 715 (Fed. Cir. 2014) ...............................................................................7

*IGT v. Bally Gaming Int'l, Inc.*,
    659 F.3d 1109 (Fed. Cir. 2011)............................................................................18

*Input/Output, Inc. v. Sercel, Inc.*,
    No. 5:06-cv-236, 2007 WL 6196070 ......................................................................22

*Koito Manufacturing Co., Ltd. v. Turn-Key-Tech, L.L.C.*,
    381 F.3d 1142 (Fed. Cir. 2004)......................................................................18, 19

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S.Ct. 2120 (2014)................................................................................. passim

*Omega Eng'g Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)............................................................................16

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .....................................................................2, 3, 30

*Profectus Technology LLC v. Huawei Technologies Co., Ltd.*,
    No. 6:11–cv–474, 2014 WL 1575719 (E.D. Tex. Apr. 17, 2014) ..........................................23

*Randall May Int'l, Inc. v. DEG Music Prods., Inc.*,
    378 Fed. App'x 989 (Fed. Cir. 2010) .................................................................18

*Rheox, Inc. v. Entact, Inc.*,
    276 F.3d 1319 (Fed. Cir. 2002)..........................................................................12

*Saffran v. Johnson & Johnson*,
    712 F.3d 549 (Fed. Cir. 2013) .............................................................................7

*Schriber-Schroth Co. v. Cleveland Trust Co.*,
    311 U.S. 211 (1940).......................................................................................11, 12

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)............................................................................3

## STATUTES

35 U.S.C. section 112 ...................................................................................................19

35 U.S.C. § 112(2) .......................................................................................23, 25, 26, 28

## I.    INTRODUCTION

This case involves seven related patents in the field of display backlighting technology, sharing essentially identical specification content – U.S. Patent Nos. 6,755,547 ("the '547 patent") (Ex. A); 7,300,194 ("the '194 patent") (Ex. B); 7,384,177 ("the '177 patent") (Ex. C); 7,404,660 ("the '660 patent") (Ex. D); 7,434,974 ("the '974 patent") (Ex. E); 7,537,370 ("the '370 patent") (Ex. F); and 8,215,816 ("the '816 patent") (Ex. G).   Many of the asserted patent claims use terminology that fails to put the public on notice as to what is and is not covered by the asserted patent monopoly, making them invalid.   In a number of claims, the patentee chose to use terms of degree for which the patents provide no standard by which they could be judged, and, in others, used another term that requires a similarly standardless, subjective assessment. These claims fail in light of the indefiniteness standard recently announced by the Supreme Court in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120 (2014), but also would have failed under previous case law.   In addition, a party cannot repair holes in the patent specification with expert testimony, as Plaintiff attempts to do here, much less expert testimony submitted in violation of this Court's Local Patent Rules.[1]

As to the terms that can and should be construed, Plaintiff seeks to avoid clarifying the terms or committing to an interpretation of their scope, instead seeking no construction.   For example, it repeatedly asks the Court to just tell the jury that the term should be understood to have its "plain and ordinary meaning"—without saying what that plain and ordinary meaning is, even though Plaintiff's infringement contentions read the terms in ways contrary to their common sense meanings and to the intrinsic evidence.   And for terms where Plaintiff does offer

---

[1] Plaintiff did not disclose its reliance on expert testimony prior to serving its opening claim construction brief, in violation of Local Patent Rule 4-3(b).   Defendants have filed a motion to strike.   *See* Dkt. No. 72.   Plaintiff has argued that the *Nautilus* decision justified its violation of the Patent Rules.   That is wrong, as *Nautilus* did not change either the role that expert testimony could play in an indefiniteness analysis or that the indefiniteness analysis is performed from the perspective of one of ordinary skill in the art at the time of the patent application.

a construction, it fails to take proper account of the intrinsic record.  Defendants' proposed constructions, conversely, define the terms in light of the intrinsic evidence and in a way that will aid the jury.

For the reasons discussed below, Defendants respectfully request that the Court adopt Defendants' proposed constructions of the disputed claim terms and find certain asserted claims of the '547, '194, '177 and '370 patents indefinite and invalid.

## II.    THE PROPER CONSTRUCTION OF DISPUTED CLAIM TERMS

### A.    "pattern of deformities" ('547 patent, claim 1; '660 patent, claims 1, 33) / "pattern of light extracting deformities" ('974 patent, claims 1, 7, 13; '370 patent, claims 1, 13, 29, 47; '816 patent, claim 1)

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning (using the agreed definition of "deformities."). | "a pattern of deformities that can be an ordinary pattern, random placement pattern, or a variable pattern" |

The overall terms "pattern of deformities" and "pattern of light extracting deformities" require no further construction, because the parties have agreed to the construction of the underlying term "deformities."[2]  Only the word "pattern" remains unconstrued.  "Pattern" is not, however, a term of art, and construing this common word would not help clarify its meaning to the jury.  *See Phillips v. AWH Corp., 415 F.3d 1303,* 1314 (Fed. Cir. 2005) ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").[3]

---

[2] The agreed construction for "deformities" is "any change in the shape or geometry of a surface and/or coating or surface treatment that causes a portion of the light to be emitted." P.R. 4-3 Joint Claim Construction and Prehearing Statement at 2.

[3] As the Court is aware, claims are to be construed from the perspective of a hypothetical person of ordinary skill in the art at the time of the application for the patent. *Phillips*, 415 F.3d at 1313. The patents-in-suit all stem from the same patent application, filed on June 27, 1995. One of ordinary skill in the art at that time would have held an

The patent specification uses "pattern" consistent with its plain English meaning to a layperson without providing any special definition for the term.  For example, the patents explain that the "pattern of light extracting deformities . . . provide a desired light output distribution." '547 patent at 1:49-51 (Ex. A).  Figure 4a provides an example of "one form of pattern of light extracting deformities," '547 patent at 2:19-20 (Ex. A), that "includes a variable pattern."  *Id.* at 4:46-53 (Ex. A).  Other examples of "patterns" of light extracting deformities can be found in Figures 4b, 4c and 4d.

  

These examples show that the specification uses "pattern" of light extracting deformities in nothing more than its customary way without any indication that "pattern" has a special technical meaning.  It therefore should be given its plain and ordinary meaning.  *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Rather than impart understandable meaning to the term "pattern," IDT's construction attempts to change the claim by adding a series of modifiers to this single familiar word.[4]  IDT's proposed construction does not promote clarity because it requires a pattern of deformities to be one of three distinct things: "an ordinary pattern, [a] random placement pattern, or a variable pattern" without explaining what any of these three terms mean or what the difference between

---

undergraduate degree in physics, material science, electrical engineering, or applied mathematics and three years of work experience (or a graduate degree) in a field related to optical technology.

[4] Plaintiff has abandoned, without notice or explanation, the constructions of these terms that it had asserted in its P.R. 4-3 filing: "an arrangement or placement of [light-extracting] deformities."

them is.   And IDT's proposed construction apparently would—without any explanation—exclude some types of patterns.   IDT's construction leaves the jury to determine what makes a pattern "ordinary," what makes it "variable," and what makes it a "random placement pattern," how these three are distinct from each other, and what other "patterns" might exist.   Moreover, none of IDT's examples explain what a *pattern* actually is, because each uses the word to define itself.   None of this is necessary or useful because the claims just use "pattern" alone.

In addition, the patent specification does not clarify or support IDT's proposed construction.   The term "ordinary pattern" is not a well understood term, particularly in the context of the patents in suit, and nothing in the patent specification describes what this means. Indeed, the phrase is not found anywhere in the patent.   And IDT's own arguments show that it cannot distinguish between variable patterns and random placement patterns.   For example, IDT focuses on Figure 4a, alleging that it shows a random placement pattern.   Plaintiff's Opening Claim Construction Brief ("IDT Op. Br.") at 6-7.   But the patent clearly explains that "FIG 4a includes a ***variable*** pattern." (emphasis added.)   The mark-up of Figure 4a below shows four magnified close-ups of the panel member.



'547 patent, Fig. 4a (annotations in red)

On the right, in the close-up (21) nearest the light source (3), the diagonal pattern of deformities is fairly diffuse.   Moving to the left in Figure 4a, the pattern gets more and more

dense as the close-ups magnify portions of the panel farther away from the light source, until the diagonal lines become thick enough to meet each other at certain points at the very left edge of the panel.  The patent describes this as a "variable pattern" because it varies with location.  *See* '547 patent at 5:16-22 ("A pattern of light extracting deformities 21 may be used to adjust for the light variances within the panel members, for example, by providing a denser concentration of light extracting deformities with increased distance from the light source.") (Ex. A).  Contrary to this description in the patent, IDT argues that the leftmost portion of the panel in Figure 4a "graphically depicts a ***random*** placement pattern," IDT Op. Br. at 6 (emphasis added, quotations omitted), highlighting the confusion inherent in its construction.

IDT's construction deviates from the ordinary and customary meaning of "pattern" by listing several undefined pattern types that it tries to support with arguments inconsistent with the specification.  Such a construction is improper.  Because the parties agree on the meaning of "deformities," and "pattern" is not a term of art, further construction will not aid the jury.

    **B.**    **"continuous side walls" ('177 patent, claims 1, 15)**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| "uninterrupted walls that are free of breaks on the side of the tray" | Plain and ordinary meaning<br><br>In the alternative only, if the Court determines that this term should be construed<br><br>"side walls that completely surround" |

Defendants' construction guides the jury as to what "continuous" means in the context of the claims.  One function of the tray in the light emitting assembly is to reflect light back into the assembly and prevent light from escaping.  *See, e.g.,* '177 patent at 1:46-52; 3:23-31 (Ex. C); Plaintiff's Tech. Tutorial ("PTT"), Slide 16.  Plaintiff's narration for slide 16 calls the reflective efficiency of the side walls "critical to their [light emitting assembly's] operation."  *Id.*  Further,

Plaintiff's narration of slide 22 concedes that light emitting assemblies are designed "to lose the least light possible."  If the reflective walls are not continuous, *i.e.*, have interruptions or gaps, light can escape the assembly, increasing the amount of light lost.  Defendants' proposed construction of "continuous side walls" is true to the purpose of the side walls and the intrinsic evidence.

Although "continuous side walls" does not appear in the text of the specification, Figure 6 of the specification (below) shows a tray (35) with a cavity or recess (36). '177 patent at 6:65-67 (Ex. C).  The walls are smooth and without breaks.  Thus the only disclosure that even arguably supports the "continuous side walls" term shows uninterrupted walls, free of breaks on the side of the tray.



Neither "continuous" nor "side walls" is found in the original application. Rather, they were added in an amendment to overcome a rejection based on U.S. Patent No. 5,070,431 to Kitazawa et al. ("Kitazawa"). *See* October 3, 2007 Office Action, JD0002569-570 (Ex. H). The examiner stated that Kitazawa discloses a tray, element 12, shown below, from Fig. 2. *Id*.



**Kitazawa, Fig. 2**

The applicant responded by amending claims 1 and 15 to further limit the tray to one "having a back wall and continuous side walls that ~~forms~~ form a hollow cavity or recess completely surrounded by the side walls." January 22, 2008 Response to Office Action at JD0002580 (emphasis and strikethroughs in original) (Ex. H). The applicant argued that, "Kitazawa does not have a back wall and continuous side walls. . . ." *Id.* at JD0002586 (Ex. H). In Kitazawa's Figure 2, the side walls of the tray (12) are interrupted or broken by indentations at 12a and 12b, where light sources are placed. The applicant was clear during prosecution: the continuous side walls must be free of interruptions and breaks. *Cf. Saffran v. Johnson & Johnson*, 712 F.3d 549 at 558-59 (Fed. Cir. 2013) (finding prosecution disclaimer due to statements distinguishing prior art).

Indeed, the ordinary English meaning of "continuous" is "[u]ninterrupted in time, sequence, substance, or extent." *American Heritage Dictionary of the English Language* (3d ed. 1996), at JD0008108 (Ex. I).  By their ordinary meaning, "continuous side walls" are those that are uninterrupted in substance or extent—in other words, side walls that are free of breaks.

Plaintiff's construction adds redundant language, rendering other terms of the claims superfluous. *See Frans Nooren Afdichtingssystemen B.V. v. Stopaq Amcorr, Inc.*, 744 F.3d 715, 723-724 (Fed. Cir. 2014). If Plaintiff's construction is substituted into the claim, the claim would read "***side walls that completely surround*** that form a hollow cavity or recess completely surrounded by the side walls." The addition of "that completely surround" is already addressed by a handful of words later in the claim. Plaintiff's construction is redundant and would add nothing except to make superfluous the language "surrounded by the side walls."

In addition, IDT's proposed construction improperly reads out a key claim term: "continuous."  Under IDT's proposed construction, the claim limitation would be satisfied if the side walls "completely surround" the claimed cavity, irrespective of whether the side walls were

continuous or discontinuous.  The claim language, however, expressly requires not only that the side walls "completely surround[]" the cavity, but that they be "continuous":  "**continuous side walls** that form a hollow cavity or recess **completely surrounded by the side walls.**"

A person of ordinary skill in the art would understand that the side walls must be free of breaks to be continuous.  The phrase "continuous side walls" means "uninterrupted walls that are free of breaks on the side of the tray." [5]  This construction is consistent with the plain and ordinary meaning of "continuous," the specification, the prosecution history, and the extrinsic evidence, and, unlike Plaintiff's proposed construction, does not contradict and render superfluous other claim limitations.

**C.**     **"transition region" ('660 patent, claims 1, 3, 10, and 33; '370 patent claims 13 and 47)**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| "a region that spreads and transmits light" | Plain and ordinary meaning.  In the alternative only, if the Court determines that this term should be construed:<br><br>"an area used to make the transition from the light source to the light emitting area of the panel member ['370 patent] / optical conductor ['660 patent]" |

The meaning of "transition region" is not readily apparent, and guidance from the Court would assist the jury, because "transition" has different meanings in different contexts.  "Transition region" does not appear in any of the patents' specifications, and appears only in the Abstract of the '660 patent (Ex. D): "A transition region is disposed between the light source and output region that is **configured to spread and transmit the light by the light source to the**

---

[5] Plaintiff argues that Defendants' construction "implies that there is one 'side of the tray' because the word "side" is singular in Defendants' construction.  Plaintiff's argument is a red herring (and was not raised during the multiple meet and confers leading to submission of the Joint Claim Construction Chart).  Defendants do not contend that the tray must only have one side.  The point is that the walls of the tray that form the hollow recess are without interruption and are free of breaks. IDT Op. Br. at 9.

*output region*." (emphasis added.)    Whereas Defendants' construction tells the jury *what* the transition region is, Plaintiff's construction merely states *where* the transition region is. Plaintiff's construction adds nothing to help understand the claim term—the claim language itself already describes the location of the transition region for each claim.  *See* '660 patent, claims 1 and 33 (Ex. D) ("the optical conductor having a transition region disposed between the light source and the output region"); '370 patent, claims 13 and 47 (Ex. F) ("wherein the panel member has a transition region between the at least one input edge and the patterns of light extracting deformities"). In contrast, Defendants' construction adds meaning to explain what type of "transition" is provided by the region.

Plaintiff's tutorial defines "transition region" as Defendants do. Plaintiff describes the transition region as a zone between the light source and light guide panel that "allows light to distribute more evenly when it first enters the panel." PTT, Slide 13.  Plaintiff's phrase "distribute more evenly" is merely another way to say *spread* the light.  Plaintiff's tutorial description of a transition region is precisely Defendants' construction.

In addition to being consistent with Plaintiff's technical tutorial, Defendants' construction informs the jury what "transition" means in the context of the patents.  Specifically, Defendants' construction focuses on the meaning of "transition" within the term "transition region."  The '660 patent discloses, and the Plaintiff's technical tutorial admits, that light is spread and transmitted in the "transition region."  '660 patent, Abstract (Ex. D); PTT, Slide 13.  The "transition region" spreads and transmits light between the light source and the output region or between the input edge and the patterns of light extracting deformities.  *See, e.g.,* '660 patent, Fig. 7, claims 1 & 33 (Ex. D); '370 patent, claims 13 and 47 (Ex. F).  If the transition region (43) did not spread and transmit light, then light from light sources (3) would not be evenly distributed in the light emitting

panel (42), which is a primary function of the transition region, as Plaintiff admits.  PTT, Slide 13.



In contrast, Plaintiff's "plain and ordinary" construction offers no help to the jury to understand what this region of a highly technical device is or does.  And Plaintiff's alternative construction would confuse the jury because it would allow the transition region to be merely a light conduit, which is contrary to how the patent depicts the "transition region" and Plaintiff's description in its own technical tutorial of the transition region as one that spreads and transmits the light.  Moreover, Plaintiff circularly uses "transition" in its alternative construction to define the term "transition." Plaintiff's circular construction does not provide any clarity.

Plaintiff's claim differentiation argument also does not support its construction because the two claims do not have the same scope.  The asserted claims use the term in dispute here, "transition region." However, unasserted claim 2 of the '660 patent uses the term "transition region configured to spread and transmit the light."  The language "configured to" is not in Defendants' construction or the asserted claims and distinguishes the dependent claim from Defendants' construction because "configured to," like all claim terms, must have meaning, making claim 2 distinct from Defendants' construction and thereby differentiating the two claims.  By Plaintiff's argument, if Defendants' construction and the language of the dependent claim were equivalent, then "configured to" would itself be rendered meaningless.

The phrase "transition region" means "a region that spreads and transmits light." Defendants' construction is accurate, supported by the evidence, and should be adopted by the Court.

**D.**     **"at least some of the light extracting deformities on or in one of the sides are of a different type than the light extracting deformities on or in the other side of the panel member" ('370 patent, claims 1, 13)**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| "at least some of the deformities on or in one side of the panel member are different than the deformities on or in the other side of the panel member in characteristics other than shape" | Plain and ordinary meaning. |

Defendants' construction appropriately reflects the context of the '370 patent as set forth in the intrinsic record, making clear that the "different types" of deformities on the "panel member" differ in characteristics other than shape, as required by IDT's actions in obtaining these claims.  By contrast, IDT does not propose a construction, thereby failing to take into account its disavowal of claim scope.

"It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent." *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-21 (1940) (patentee deleted a phrase during prosecution, which was a relinquishment of claim scope not recoverable during litigation).  In a January 15, 2009 response to an office action, Applicants for the '370 patent amended independent claim 1 to claim "a different type" rather than "a different type or shape."  '370 File History at IDT0000748 (Ex. J).  Applicants made similar amendments to claim 15, which issued as independent claim 13.  *Id. at* IDT0000750-51 (Ex. J). Having removed "different...shape" from the scope of the claim, IDT cannot reclaim that scope

through its construction of the term "type."  *Schriber-Schroth*, 311 U.S. at 220-21; *Rheox, Inc. v. Entact, Inc.,* 276 F.3d 1319, 1326-27 (Fed. Cir. 2002) (deletion of "triple superphosphate [TSP]" from a claim clearly limited the scope to not encompass TSP).

Defendants' construction is consistent with the specification, which indicates that "type" and "shape" are separate, non-overlapping properties.

> The pattern of light extracting deformities on or in one side may have two or more different **types or shapes** of deformities and at least one of the **types or shapes** may vary along the length or width of the panel member. Where the light extracting deformities are on or in both sides, at least some of the deformities on or in one side may be of a different **type or shape** or vary in a different way or manner than the deformities on or in the other side.

'370 patent at Abstract (emphasis added) (Ex. F).  The specification also recites that the light output of the panels can be controlled by "varying the density, opaqueness or translucence, **shape**, depth, color, area, index of refraction, or **type** of deformities 21 on an area or areas of the panels."  '370 patent at 4:62-64 (Ex. F) (emphasis added).  By using the disjunctive "or," applicants indicated that "type" and "shape" are separate, non-overlapping properties. Defendants' construction therefore appropriately reflects the meaning suggested by the '370 specification in light of the prosecution history.  In other words, by deleting from the claims the word "shape," applicant chose the separate, non-overlapping property "type" and disavowed a claim scope that would also encompass "shape."  *See Schriber-Schroth*, 311 U.S. at 220-21; *Rheox*, 276 F.3d at 1326-27.

Despite this clear statement, IDT erroneously argues that "type" encompasses "shape." IDT relies on dependent claims 16 and 17, which require at least one of the types of deformities to be "prismatic" or "lenticular," respectively. IDT asserts (without support) that "prismatic" means "in the shape of a prism" and that "lenticular" means "in the shape of a specific lens," thereby inferring that "type" includes "shape."  IDT Op. Br. at 13.  But nothing in the

specification supports a shape-limited definition for these terms.  Fig. 4b illustrates deformities with "prismatic surfaces 23… [that] cause a portion of the light rays contacted thereby to be emitted from the panel member… [where] the angles of the prisms… may be varied to direct the light in different directions to produce a desired light output distribution or effect."  '370 patent at 5:63–6:5 (Ex. F). The specification clearly is directed to defining a "prismatic-type" deformity with regard to its basic nature, not its shape.  The patent specification does not use "lenticular" anywhere but in the claims, so IDT's attempt to limit the term to anything narrower than "concerning a lens" is not supported.  Accordingly, no evidence suggests that applicants meant to associate shape-only terms with the "type" of deformity because "prismatic" and "lenticular" are not shapes.

      **E.**     **"an air gap therebetween" ('547 patent, claim 1) / "an air gap between the film, sheet, plate or substrate and the panel member" ('194 patent, claim 1)**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| "a continuous layer of air between the separate transparent sheet or film and the light emitting area such that they have no direct physical contact" ['547 patent] | Plain and ordinary meaning. |
| "a continuous layer of air between the sheet, film, plate or substrate and the panel member such that they have no direct physical contact" ['194 patent] | Plain and ordinary meaning. |

Both claim 1 of the '547 patent and claim 1 of the '194 patent require a continuous layer of air such that the light emitting surface has no direct physical contact with the second component.  IDT offers *no evidence whatsoever* that the "plain and ordinary meaning" of the "air gap" terms would allow the components with an air gap between them to touch each other, as IDT's interpretation suggests.  The term "gap" indicates separateness, not contact.  The ordinary meanings of "gap" and "between"/"therebetween" all require that the claimed "air gap" is a

continuous layer between the separate components such that they have no direct physical contact. Contrary to IDT's proffered reading, the claimed "air gap between" is not created merely because there is an imperfect fit between two components that are in contact; that is not what the inventor disclosed or claimed.

The specification helps define this term. Figure 5 of the '194 patent (below) shows two "air gaps 30," one between the back reflector 26 and light emitting panel 14 (at the bottom of the figure), and one between the light emitting panel and sheet or film 27 (at the top of the figure). The air gap is formed when an adhesive (item 28 in Figure 5) adheres the peripheral edges of the light panel to the other surface. '194 at 6:45-51; Fig. 5. (Ex. B). Figure 5 shows, and the specification text teaches, that both air gaps are continuous, and the light emitting panel does not touch the back reflector 26 or sheet or film 27. If the light emitting panel 14 touched the back reflector 26 or sheet or film 27, there would be no air gap between them (indeed, no gap at all).



The only other references in the specification to an "air gap" are examples of "eliminat[ing] any air gaps" by embedding, potting or bonding the light source into the light transition area. '194 patent at 1:38-44; 3:60-65 (Ex. B). The specification thus teaches that, where two surfaces are in contact, the "air gap" is eliminated. Plaintiff's proposed reading of "air gap" thus directly contradicts the intrinsic evidence.

IDT contends that the deformities touch the light emitting area/surface and that the imperfect fit between them creates air gaps. IDT Op. Br. at 15; PTT, Slide 21. This is incorrect for several reasons, including because the deformities are part of the claimed sheet or film itself.

'547 patent, claim 1 (stating "a pattern of deformities on one side of the sheet or film"); *id.* at 4:42-46 ("the term deformities or disruptions are used interchangeably to mean any change in the shape or geometry *of the panel surface and/or coating or surface treatment* that causes a portion of the light to be emitted") (emphasis added) (Ex. A).  If deformities that are part of the sheet or film touch a second surface, then the sheet or film is touching that other surface, and there is no air gap between them.[6]

The prosecution history further confirms Defendants' reading of the "air gap" terms.  The applicant obtained the '547 patent only after overcoming the examiner's rejection in light of U.S. Pat. No. 6,129,439 to Hou ("Hou").  He did so by asserting that Hou did not disclose the claimed "air gap."  The difference, he argued, was that Hou disclosed a "reflecting means 18 (including the spacer 82 that separates the microlenses 80 and microprisms 28) [that wa]s optically coupled to the wave guide 16."  *See* '547 File History at IDT0000044 (Ex. K).  Spacer 82 of Hou was touching (and thus "optically coupled to") the light-emitting wave guide 16 only via deformities (microprisms 28) that touched the wave guide.[7]  Plaintiff's argument that two elements in direct contact via deformities have an intermittent air gap should be rejected because it directly contradicts applicant's prosecution argument that Hou's intermittent air gap was not the claimed "air gap."  *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333-34 (Fed. Cir. 2003) (statements made during prosecution apply to closely related patents).

---

[6] Defendants' construction is further supported (and Plaintiff's construction is further contradicted) by the teachings of the '974 patent, which shares a common specification with the '547 and '194 patents.  *See* '974 patent, unasserted claim 17 ("at least one of a tab, hole, cavity, or protrusion holds the additional component away from the panel member to create an air gap between the panel member and the additional component") (Ex. E).
[7] Contact was either directly or through an "optional adhesion-promoting layer 26."  Hou at 4:18-19, attached hereto as Exhibit L.



**Hou, Fig. 3**                                    **IDT's depiction, PTT, Slide 21**

Extrinsic evidence also supports Defendants' construction.  The plain meaning of "gap" requires "an opening" or a "suspension of continuity."  *See, e.g., Webster's II New Riverside University Dictionary* (1984) at JD0008132 (Ex. M) ("gap": "1. An opening, as in a wall . . . . 3. A suspension of continuity. . . .") The plain meaning of "between" (and, by extension, "therebetween") requires separation.  *See, e.g., Webster's II Ninth New Collegiate Dictionary* (1988) at JD0008123 (Ex. N) ("between" - "2a: in the time, space, or interval that separates"; "in an intermediate space or interval"); *Webster's II New Riverside University Dictionary* (1984) at JD0008131 (Ex. M) ("between" - "In the interval or position separating"). An air gap is between two surfaces where those surfaces are "on opposite sides of" the air gap.  *See, e.g. The Compact Oxford English Dictionary* (2d ed. 2004) at p. 154 (Ex. O).

The plain words of the claims, the specification, and the prosecution history all confirm that the claimed "air gap between" (or therebetween) is a continuous layer of air that prevents the claimed sheet or film from touching the light emitting area or panel member.

F.    **"desired light output distribution" ('547 patent, claim 1) / "desired light output distribution or effect" ('194 patent, claim 23) / "desired light output color or uniformity" ('177 patent, claim 15) / "desired light output" ('547 patent, claim 1; '194 patent, claim 23; '177 patent, claim 15)**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| "desired light output" means "a specific pre-identified output" | Plain and ordinary meaning. |

| "distribution," "distribution or effect," and "color or uniformity" should be understood to have their plain and ordinary meaning." | |

The proper construction for "desired light output" is "specific pre-identified output.[8] This is consistent with the specification, which uses "desired light output" to convey that a specific output is pre-identified in order for other structures to perform the function of the alleged invention. For example, the specification describes that the purpose of "a desired light output distribution [is] *to fit* a particular application." '547 patent at 3:6-7 (Ex. A). While the specification is silent as to how such fitness might be judged, *see* below at § III.B.4, at the most basic level, the application is understood before manufacture and a light output is pre-identified with an eye towards that application. Similarly, the pattern of light extracting deformities is designed and manufactured for a particular light output distribution, and it would not be possible to design or manufacture those deformities without considering the output. *See, e.g.,* '547 patent at 1:49-51 ("a pattern of light extracting deformities or disruptions <u>which provide</u> a desired light output distribution"); *see also id.* at 6:12-14 ("light in different directions <u>to produce</u> a desired light output distribution or effect"); *id.*at 7:23-24 ("LEDs can be mixed <u>to produce</u> a desired light output") ("Ex. A) (emphases added). Indeed, the Federal Circuit has recognized that use of the term "desired" "requires foreknowledge and even intent on the part of the person practicing the invention." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1356 (Fed. Cir. 2005), abrogated on other grounds by *Nautilus*, 134 S.Ct. at 2124. And the Federal Circuit has also held that "the construction of a patent term may require an actor to have knowledge of certain facts," a scienter requirement required of the term "desired." *Koito Manufacturing Co., Ltd. v. Turn-Key-Tech, L.L.C.*, 381 F.3d 1142, 1150 n.2 (Fed. Cir. 2004).

---

[8] In its Opening Claim Construction Brief, Plaintiff incorrectly states Defendants' proposed construction as "specific, predefined." *See* IDT Op. Br. at 18.

Plaintiff merely contends, without basis, that this term should be given its "plain and ordinary meaning," and offers only conclusory arguments that anyone would simply "know what the word 'desired' means." IDT Op. Br. at 18. But this is a term that demands a particular construction to clarify that it does not and cannot mean *any* resulting output, which would render "desired" meaningless. *See Randall May Int'l, Inc. v. DEG Music Prods., Inc.*, 378 Fed. App'x 989, 998 (Fed. Cir. 2010) (("all the limitations in a claim must be considered meaningful") *citing Cablestrand Corp. v. Wallshein,* 29 F.3d 644 (Fed. Cir. 1994)); *see also* '547 patent at 1:48-53; 3:2-7; 6:8-16; 7:19-24 (Ex. A).

### G. "predetermined" ('370 patent, claims 1, 13, 29, 47; '660 patent, claims 1, 33; '177 patent, claim 1)

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
| --- | --- |
| "chosen in advance" | Plain and ordinary meaning. |

The proper construction for "predetermined" is "chosen in advance." This construction is consistent with recent Federal Circuit precedent, and is offered to clarify the term and assist the fact-finder in a way that "plain and ordinary meaning" would not. *See IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1118 (Fed. Cir. 2011) (construing the term "predetermined event" as "the occurrence of one or more conditions chosen in advance" and holding that such a construction "retains its plain meaning."). Furthermore, Defendants' construction is not only consistent with the specification of the '370 patent (Ex. F), *see* 2:58-65; 5:17-23; 6:65-7:1; 7:38-45, but is also supported by extrinsic evidence. *See, e.g., Longman Dictionary of Contemporary English* (New Ed. 1995) at JD0008020 (Ex. P) ("if something is predetermined, it has been formed or arranged before it happens, and does not happen by chance");*Oxford Advanced Learner's Encyclopedic Dictionary* at JD0008026 (Ex. Q) ("decide or fix . . . in advance; prearrange"); *The American Heritage Dictionary* (3d ed. 1994) at JD0008050 (Ex. R) ("To

determine or decide in advance."); *The American Heritage Dictionary of the English Language* (3d ed. 1996) at JD0008116 (Ex. I) ("To determine, decide, or establish in advance."). Defendants' construction properly recognizes that the patentee "chose to limit its claims with a scienter requirement." *Koito Manufacturing,* 381 F.3d at 1150 n.2.  Finally, Plaintiff's argument that "chosen in advance" imports a process limitation makes little sense; to the extent any such process limitation is arguably present, it is equally present under Plaintiff's "plain and ordinary" meaning approach to "predetermined."

H.  **"posts, tabs, or other structural features that provide a mount" ('974 patent, claim 1, 7)**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| "posts, tabs, or other structural features that extend outward from the tray and upon which the assembly is mounted" | Plain and ordinary meaning. |

Defendants concur that this term may be given its plain and ordinary meaning.

III.  **THE ASSERTED CLAIMS OF THE '547, '194, '177 AND '370 PATENTS ARE INDEFINITE AND INVALID**

A.  **The Definiteness Requirement**

1.  **The Legal Standard for Indefiniteness**

35 U.S.C. section 112 requires patent claims to be definite:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.

On June 2, 2014, in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120 (2014), the United States Supreme Court unanimously overruled the Federal Circuit's "insolubly ambiguous" standard, in favor of a "reasonable certainty" standard for assessing section 112's definiteness requirement:

> According to the Federal Circuit, a patent claim passes the §112, ¶2 threshold so long as the claim is "amenable to construction," and the claim, as construed, is not "insolubly ambiguous."   We conclude that the Federal Circuit's formulation, which tolerates some ambiguous claims but not others, does not satisfy the statute's definiteness requirement.   In place of the "insolubly ambiguous" standard, we hold that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with ***reasonable certainty***, those skilled in the art about the scope of the invention.

*Nautilus*, 134 S.Ct. at 2124 (emphasis added) (citation omitted).   As the Supreme Court explained, section 112's definiteness requirement performs an important public notice function:

> It cannot be sufficient that a court can ascribe *some* meaning to a patent's claims; the definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters post hoc.  To tolerate imprecision just short of that rendering a claim "insolubly ambiguous" would diminish the definiteness requirement's public-notice function and foster the innovation-discouraging "zone of uncertainty" … against which this Court has warned.

*Id.* at 2130 (emphasis in original) (citing *United Carbon Co. v. Binney & Smith Co*., 317 U.S. 228, 236 (1942)).   The Federal Circuit's rejected standard—under which ambiguous claims could be allowed—was the standard in effect during the prosecution of the claims at issue.

Whether a patent claim satisfies the definiteness requirement is a "legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."  *Datamize,* 417 F.3d at 1347.   A definiteness inquiry requires that: (1) definiteness is "evaluated from the perspective of someone skilled in the relevant art;" (2) "in assessing definiteness, claims are to be read in light of the patent's specification and prosecution history;" and (3) definiteness be "measured from the viewpoint of a person skilled in the art at the time the patent was filed." *Nautilus*, 134 S.Ct. at 2128 (emphasis omitted).

## 2.    Terms of Degree are Indefinite if the Specification is Deficient

In an indefiniteness analysis, "[w]hen a word of degree is used, the district court must determine whether the patent's specification provides some standard for measuring that degree."

*Datamize*, 417 F.3d at 1351; *see also Endo Pharmaceuticals Inc. v. Watson Labs., Inc.*, No. 2:13-cv-192, 2014 U.S. Dist. LEXIS 84804, at *24 (E.D. Tex. June 23, 2014) (Gilstrap, J.) ("Words of degree can be problematic where they require a subjective inquiry.  For that reason the Federal Circuit has required that a patent containing claims requiring such a subjective inquiry provide an 'objective anchor' that identifies the bounds of the claim.").  This District has considered indefiniteness challenges many times under the pre-*Nautilus* standard, including where terms of degree have been at issue.  For example, in *Advanced Display Technologies of Texas, LLC v. AU Optronics Corp.* (hereinafter "*ADT*"), which like this case concerned optical display patents, defendants challenged two terms of degree as indefinite:

> 1. An optical diffuser comprising a polymerized material layer on a transparent or translucent substrate, which layer has a ***highly modulated*** surface having ***smooth bumps*** ranging from about 1 micron to about 20 microns in both height and width.

*Advanced Display Technologies of Texas, LLC v. AU Optronics Corp.*, No. 6:11-cv-00391-LED (E.D. Tex.) 2012 WL 2872121, *12 (E.D. Tex. July 12, 2012) ("*ADT* Order") (quoting U.S. Patent No. 6,261,664) (emphasis added to disputed terms).  The Court held the claim indefinite because that "[t]he '664 patent…fails to provide a standard for measuring the difference between a mere modulated surface and a *highly* modulated surface….  As such, the patent fails to provide a person of ordinary skill in the art an objective anchor against which a potentially infringing product may be compared[.]" *Id.* at **12-13 (italics in original).  The Court also found "smooth bumps" indefinite because:

> the '664 specification fails to provide any objective anchor to determine how smooth the bumps must be to facilitate such a function; or even how to measure the "smoothness" of the bumps to reach the proper threshold of smoothness. Additionally, ADT's proposed construction itself provides no such guidance by using such unbounded and imprecise terms as "minimizing" and "increasing." ADT essentially argues for a construction of an unbounded term of degree by using other terms of degree.

***

21

> Much like the "highly modulated" term, the '664 claims and specification simply fail to provide any objective guidance to determine when a bump is "smooth." While ADT identifies alleged purposes of the invention, nothing in the specification ties the "smoothness" of the bumps to "minimizing" of backscatter or the "increasing" of optical efficiency....Accordingly, Claim 1 of the '664 patent is indefinite because the claims and specification fail to provide an objective standard to determine whether a bump is "smooth."

*Id* at **14-15.

### 3.     Expert Testimony Cannot Supply a Missing Specification Disclosure

A patent holder cannot save a claim from indefiniteness through expert testimony to supplement a patent's disclosure. *Datamize*, 417 F.3d at 1351 ("When a word of degree is used, the district court must determine whether the patent's specification provides some standard for measuring that degree.") (quoting *Seattle Box Co, v. Industrial Crating & Packaging, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984)); *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005) ("[T]he testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification."); *see also ADT* Order at *13 (expert testimony "should be discounted when it is inconsistent with a claim construction as required by the claims."); *Input/Output, Inc. v. Sercel, Inc.*, No. 5:06-cv-236, 2007 WL 6196070, **26-28 (E.D. Tex. Dec. 19, 2007) (report and recommendation), *aff'd* 2008 WL 5427982, No. 5:06-cv-236, (E.D. Tex. Apr. 28, 2008) (rejecting attempt to supplement specification's deficiencies with expert declaration and holding claim term "small positive differences" indefinite).

### B.     Indefinite Terms

### 1.     "well defined optical elements or deformities" ('194 patent claims 1, 16, 31) / "optical elements or deformities of well defined shape" ('194 patent, claim 28)

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| This term is indefinite under 35 U.S.C. § | Plain and ordinary meaning.  In the alternative: |

| 112(2) | |
|---|---|
| | "optical elements or deformities having clearly distinguishable limits, boundaries, or features" |

"Well defined optical elements or deformities" is an indefinite term of degree.  Patent terms are to be construed so as to give every word meaning, with no words rendered superfluous. *Bicon, Inc. v. Staumann Co.*, 441 F.3d 945, 950-51 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim."); *Profectus Technology LLC v. Huawei Technologies Co., Ltd.*, No. 6:11–cv–474, 2014 WL 1575719, at *3 (E.D. Tex. Apr. 17, 2014) ("The Court must give each term meaning.") (citing *Bicon*).  Any proper construction must give meaning to "well" and "defined" in its construction of the overall claim term.

The patent specification does not inform one of ordinary skill in the art with "reasonable certainty" as to what constitutes "well defined deformities" versus just "deformities.  *See Nautilus*, 134 S.Ct. at 2129.  Because every word in a claim must be given meaning, there must be a difference between "deformities" and "well defined deformities."   Indeed, the patentee saw a difference between "deformities" and "well defined deformities," because, in the '547 patent, claim 1, the patentee simply claimed "deformities" unmodified by any further requirement as to their level of definition:

> 1.   A backlight assembly comprising …. a separate transparent sheet or film overlying the light emitting area with an air gap therebetween, a **pattern of deformities** on one side of the sheet or film….

'547 patent at 9:19-31 (Ex. A) (emphasis added).  The patent, however, does not inform one of skill in the art as to what makes a deformity "well defined" versus "defined," "undefined," or any other degree of definition.

Plaintiff argues that the patent specification "gives one of ordinary skill in the art ample guidance" about the meaning of "well defined deformities," but the specification passages that Plaintiff cites ('194 patent at 5:43-52, 5:66-6:17, and Figs. 4a-d (Ex. B)), are directed to

"*deformities*" and not to "*well defined deformities*." IDT Op. Br. at 22. While the patent speaks

to the interchangeability of "deformities" and "disruptions," '194 patent at 3:44-48 (Ex. B), and

says the deformities can even be varied in "density, opaqueness or translucence, shape, depth,

color, area, index of refraction, or type of deformities," *id*. at 5:3-5 (Ex. B),  it is completely

silent about what would make a deformity *"well defined."* Never does the patent draw the line

between "deformities" and "well defined deformities." *Cf. Endo Pharmaceuticals*, 2014 U.S.

Dist. LEXIS 84804, at **24-25 (finding claim definite where it used the objective term

"increased" and but specified the basis for comparison)

Plaintiff's reliance on the patent prosecution history and dictionaries is unavailing. *See*

IDT Op. Br. at 23-24. Every patent that a court invalidates as indefinite is one that a Patent

Office examiner allowed initially. In this case, the examiner's statement that a prior art reference

disclosed a film, sheet, or plate with an example of well-defined optical elements does not mean

that one of ordinary skill would know *the boundaries* of what constitutes "well defined

deformities." Similarly, Plaintiff cannot supplement the deficient disclosure of the patents in the

context of optical technology with generic extrinsic dictionary evidence. *AFG Industries, Inc. v.

Cardinal IG Co., Inc.*, 239 F.3d 1239, 1247-48 (Fed. Cir. 2001) ("This court has repeatedly

cautioned against using non-scientific dictionaries for defining technical words.").

2.     **"a pattern of deformities on one side of the sheet or film having a width and length that is quite small in relation to the width and length of the sheet or film" ('547 patent, claim 1)**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| This term is indefinite under 35 U.S.C. § 112(2) | Plain and ordinary meaning. |

Again, the patentee has used a term of degree – this time to claim the relationship

between the dimensions of a pattern of deformities and the dimensions of the sheet or film upon

which they are formed.  Thus, "*quite small in relation to*" is used as both a term of *relationship* and one of *degree*.

As with "highly modulated" and "smooth bumps" in *ADT*, here the patent specification provides no guidance as to what constitutes "quite small" as compared to something other than "quite small."  *See ADT* Order at **14-15.  One of ordinary skill in the art has no objective measure to determine with "reasonable certainty" whether a pattern of deformities is "quite small" in relation to the dimensions of the film or sheet. *See Nautilus*, 134 S.Ct. at 2129. Plaintiff cites '547 patent column 5, lines 42-53 because it discloses an example in which deformities are "desirably 0.006 square inch per deformity/element or less" and "print patterns are 60 lines per inch or finer." But this passage never uses the term "quite small," never states whether 60 lines per inch would be "quite small," and never gives any standard for determining whether something is "quite small." Nor can it tell one of ordinary skill in the art anything about the relationship between pattern dimensions and the dimensions of the sheet or film because it never mentions a sheet or film, much less discloses their dimensions.  Even if the specification had disclosed the dimensions of a sheet or film in the foregoing example, and even if the patentee has described the example as "quite small," neither of which the patentee did, a single example does not inform one of ordinary skill in the art as to where "quite small" begins and ends.  The patentee could have disclosed in the specification and claimed absolute dimensions or dimensional ranges for the size of the pattern, but it chose not to do so and, instead, used a vague term of degree and relationship at the risk of indefiniteness.

During prosecution the Examiner rejected the '547 patent in light of U.S. Patent No. 5,467,417 to Nakamura, and stated that "figure 2 [of Nakamura] shows that the deformities are quite small in relation to the width and length of the substrate."  Claim rejection at IDT0000053

(Ex. K). This does not aid Plaintiff. Even if the Examiner found in Nakamura something that he subjectively believed to be "quite small," that does not define the boundaries of "quite small" to one of ordinary skill in the art with the "reasonable certainty" necessary to avoid the "zone of uncertainty" that the Supreme Court found impermissible. *See Nautilus*, 134 S.Ct. at 2129-30.

Plaintiff seeks a construction of "plain and ordinary meaning" in an effort to avoid the issue. Plaintiff's arguments that "[t]he claim language itself is basic" and that the specification and prosecution provide examples, IDT Op. Br. at 26-27, simply dance around the issue; Plaintiff did not propose an alternative construction because it could not. Plaintiff's proposed construction, like the patent itself, would leave one of ordinary skill in the art (and a jury) without any basis for knowing with reasonable certainty what sized pattern would or would not be "quite small."

### 3. "pass through a liquid crystal display with low loss" ('194 patent, claims 1, 16, 28; '370 patent, claims 1, 29; '547 patent, claim 1)

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
| --- | --- |
| This term is indefinite under 35 U.S.C. § 112(2) | Plain and ordinary meaning. In the alternative only, if the Court determines that this term should be construed:<br><br>"efficiently conducts light through a liquid crystal display" |

This term's use of "*low* loss" renders it indefinite because the claim and specification provide no objective basis by which the public could judge the metes and bounds of the alleged invention. *See Datamize,* 417 F.3d at 1347 ("[T]he purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude."); *ADT* Order at **14-15 ("Much like the highly modulated term, the '664 claims and specification simply fail to provide any objective guidance to determine when a bump is 'smooth.'"). "*Low* loss" is a term of degree, and the patent's

specification must therefore "provide[s] some standard for measuring that degree." *Datamize*. 417 F.3d at 1351 (quotation omitted); *see also Endo Pharmaceuticals*, 2014 U.S. Dist. LEXIS 84804, at *24.

Here, the patent specification provides no standard and provides no public notice as to what would constitute "low loss" versus "moderate loss" or "high loss."  In response to Defendants' indefiniteness challenge, Plaintiff is able to muster only a single passage from the specification – '547 patent at 5:23-30 (Ex. A) – arguing that "light output will be more efficient." IDT Op. Br. at 27.   That passage does not mention "low loss," and sheds no light on the issue of when loss is "low" versus any other degree of loss.  Plaintiff also relies upon '547 patent column 1, lines 21-25 for the notion that the alleged invention is directed to the "more efficient utilization of light."  IDT Op. Br. at 28.  Even if taken as true, that passage does nothing to inform one of skill in the art as to what constitutes *low* loss.[9]  As a result, Plaintiff's proposed construction – "efficiently conducts light through a liquid crystal display" – fares no better.  Just as in *ADT*, here Plaintiff has proposed a construction ("*efficiently conducts light…*") that itself suffers from indefiniteness.  *ADT* Order at *14 (Court rejected proposed function of "*increasing optical efficiency*" because it replaced one term of degree with another).  And, just as in *ADT*, the patent specification here tells the reader nothing about what makes light conduction efficient versus inefficient.[10]

---

[9] The '370 patent uses the term "low loss" in only one place, and that passage provides no guidance at all as to what makes loss "low."  *See* '370 patent at 5:17-23 (Ex. F).

[10] Plaintiff also half-heartedly cites to the improperly-filed declaration of its expert. Defendants have filed a motion to strike that improper declaration, Dkt. No. 72, but the Court has not yet ruled on that motion at the time of this brief.  Plaintiff's expert declaration is improper under Local P.R. 4-3(b).  Even if the Court were not to strike Plaintiff's expert declaration, it is of low probative value as merely extrinsic evidence from a paid expert and, in addition, so conclusory that it does not shed meaningful light on the understanding of the term from the perspective of one of ordinary skill in the art.  Plaintiff cannot overcome the omissions of the patent specification with an expert declaration.

The prosecution histories of the '370, '194, and '547 patents likewise provide no guidance as to the meaning of "low loss" or of either term independently.  When applicants amended the independent claims during prosecution of the '370 patent, they included the limitations of an allowable dependent claim that recited the "low loss" term.  *See* Amendments to the Claims at IDT0000748 (Ex. J).  Applicants did not, however, comment on "low loss."  Similarly, during prosecution of the '547 patent, Applicants replaced the pending claims with "low loss" claims, but did not comment on the "low loss" term.  *See* August 5, 2003 Reply to Office Action at IDT000032-46 (Ex. K).  Furthermore, the original claims of the application for the '194 patent recited "low loss," but Applicants did not comment on the term during prosecution.  *See* July 9, 2007 Reply to Office Action, IDT000194-201 (Ex. S).  Thus, the prosecution histories of the '370, '194, and '547 patents provide no objective measure for the term "low loss."

### 4. "to suit a particular application" ('194 patent, claim 31) / "to fit a particular application" ('177 patent, claims 1, 15; '974 patent, claim 5)

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| This term is indefinite under 35 U.S.C. § 112(2) | Plain and ordinary meaning. |

The claim term "to [suit/fit] a particular application" is indefinite and therefore invalid because it fails to provide "reasonable certainty" as to the scope of the invention.  *Nautilus*, 134 S.Ct. at 2124.  Claim 1 of the '194 patent requires a "surface of the film, sheet, plate or substrate [that] has one or more reflective or refractive surfaces that are well defined optical elements or deformities for controlling the light output ray angle distribution of the light emitted *to suit a particular application*" (emphasis added).  '177 patent claims 1 and 15 similarly require "one sheet, film or substrate overlying the assembly for controlling the light emitted from the

assembly *to fit a particular application*." (emphasis added).   Nothing in the claims or specification indicates what it means for the light to be controlled in a way that is "suit[ed]" or "fit[ted] to a particular application—or, for those trying to design around the patents, *not* so suited or so fitted—much less what the "particular application" might be.  Without any such standard in the specification to reference, the infringement analysis would depend impermissibly on the subjective mindset of the accused infringer to determine whether the accused product "suit[s]" or "fit[s]" the application.  Requiring this subjective component renders this claim indefinite.  *See, e.g., Datamize*, 417 F.3d at 1350 ("The scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention.").

In a hollow attempt to save its claims, Plaintiff relies on the '194 patent at 9:1-12 to identify a list of "application[s]" upon which Plaintiff argues that one of ordinary skill could identify with "reasonable certainty" the scope of the claimed invention.  This is insufficient for two reasons. First, that passage merely provides ***examples*** of applications rather than an exhaustive list of all possible applications or, more importantly, a standard by which to identify applications.  *See id*. at 9:2-3 (Ex. B).  Neither the specification nor the relevant file histories identify a finite list of the possible applications that may be used, and in any case Plaintiff cannot improperly read embodiments into the claims in an attempt to save them.  *See, e.g.*, *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1348 (Fed. Cir. 2008) ("[W]hen claim language is broader than the preferred embodiment, it is well settled that claims are not to be confined to that embodiment."); *see also Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments").   Second, Plaintiff's argument fails to address the patents'

complete failure to provide any standard to determine when the light is controlled in a way "suit[ed]" or "fit[ted]" to an application, whether one of the examples Plaintiff points to or otherwise.   Plaintiff cannot salvage its claim by narrowing "application" to the preferred embodiment because this is both legally improper, and beside the point.

## IV.    CONCLUSION

For all of these reasons, Defendants respectfully request that the Court find that the certain terms of the '547, '194, '177, and '370 patents are indefinite and invalid, and that it adopt Defendants' proposed constructions of the disputed claim terms.

Dated:  June 30, 2014

By: */s/ Kevin Jones*

FINDLAY CRAFT LLP
    Eric Hugh Findlay
    Roger Brian Craft
    102 North College Avenue, Suite 900
    Tyler, TX 75702
    Tel: (903) 534-1100
    Fax: (903) 534-1137
    Email: efindlay@findlaycraft.com
    Email: bcraft@findlaycraft.com

TECHKNOWLEDGE LAW GROUP LLP
    Hsiang ("James") Lin
    Kevin Jones
    Michael C. Ting
    Ken K. Fung
    100 Marine Parkway, Suite 200
    Redwood Shores, CA 94065
    Tel: (650) 517-5200
    Email: kjones@tklg-llp.com

**ATTORNEYS FOR DEFENDANTS
ACER INC. AND ACER AMERICA**

By: */s/ Sean N. Hsu*

    Timothy C. Bickham
    tbickham@steptoe.com
    (*pro hac vice pending*)
    Scott M. Richey
    srichey@steptoe.com
    (*pro hac vice pending*)
    STEPTOE & JOHNSON LLP
    1330 Connecticut Avenue, NW
    Washington DC 20036
    (202) 429-5517
    (202) 429-3902 (fax)

    Jeffrey J. Cox
    jcox@hdbdlaw.com
    State Bar No. 04947530
    Sean N. Hsu
    shsu@hdbdlaw.com
    State Bar No. 24056952
    HARTLINE DACUS BARGER
    DREYER LLP
    6688 N Central Expressway, Suite 1000

Dallas, Texas 75206
(214) 369-2100
(214) 369-2118 (fax)

**ATTORNEYS FOR DEFENDANTS
HUAWEI DEVICE USA INC., HUAWEI
TECHNOLOGIES CO., LTD., AND
HUAWEI INVESTMENT AND
HOLDING CO. LTD.**

By: */s/ Richard A. Cederoth*
Harry L. Gillam, Jr.
Texas State Bar No. 07921800
GILLAM & SMITH, L.L.P.
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
gil@gillamsmithlaw.com

David T. Pritikin
dpritikin@sidley.com
Richard A. Cederoth
rcederoth@sidley.com
Douglas I. Lewis
dilewis@sidley.com
Ellen S. Robbins
erobbins@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois  60603
Telephone:  312-853-7000
Facsimile:  312-853-7036

Nabeel U. Khan
Texas State Bar No. 24074530
nkhan@sidley.com
SIDLEY AUSTIN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone:  214-981-3300
Facsimile:  214-981-3400

**ATTORNEYS FOR DEFENDANT
MICROSOFT CORPORATION**

By: */s/ Susan Baker Manning*

32

E. Leon Carter (Texas Bar No.
03914300)
lcarter@carterscholer.com
John S. Torkelson (Texas Bar No.
00795154)
jtorkelson@carterscholer.com
Joshua Bennett (Texas Bar No.
24059444)
jbennett@carterscholer.com
CARTER SCHOLER ARNETT
HAMADA & MOCKLER, PLLC
8150 N. Central Expressway, Suite 1950
Dallas, Texas 75206
Telephone: 214.550.8188
Facsimile: 214.550.8185

Susan Baker Manning
(lead counsel, *pro hac vice*)
susan.manning@bingham.com
John A. Polito (admitted to E.D. Tex.)
john.polito@bingham.com
Monica A. Hernandez (*pro hac vice*)
monica.hernandez@bingham.com
BINGHAM McCUTCHEN LLP
2020 K Street, NW
Washington, D.C. 20006-1806, U.S.A.
Telephone: 202.373.6000
Facsimile: 202.373.6001

**ATTORNEYS FOR DEFENDANTS
BLACKBERRY LIMITED AND
BLACKBERRY CORPORATION**

By: */s/ Peter J. Chassman*
    Peter J. Chassman
    Texas Bar No. 00787233
    Email: pchassman@winston.com
    Phillip D. Price
    Texas Bar No. 24060442
    Email: pprice@winston.com
    Winston & Strawn LLP
    1111 Louisiana, 25th Floor
    Houston, Texas 77002
    Telephone: (713) 651-2600
    Facsimile: (713) 651-2700

Kimball R. Anderson
lllinois Bar No. 00049980
Email: kanderson@winston.com
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, lllinois 60601-9703
Telephone: (312) 558-5858
Facsimile: (312) 558-5700

Deron R. Dacus
Texas State Bar No. 00790553
Email: ddacus@dacusfirm.com
The Dacus Firm, P.C.
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
Telephone: (903) 705-1117
Facsimile: (903) 705-1117

**COUNSEL FOR DEFENDANT,
DELL INC.**

By: */s/ Peter J. Wied*
    Harry L. Gillam, Jr.
    Texas State Bar No. 07921800
    GILLAM & SMITH, L.L.P.
    303 South Washington Avenue
    Marshall, Texas 75670
    Telephone: (903) 934-8450
    Facsimile: (903) 934-9257
    gil@gillamsmithlaw.com

    Terry D. Garnett
    tgarnett@goodwinprocter.com
    Peter J. Wied
    pwied@goodwinprocter.com
    GOODWIN PROCTER LLP
    601 S Figueroa Street
    41st Floor
    Los Angeles, California 90017
    Tel: 213.426.2500
    Fax: 213.623.1673

**ATTORNEYS FOR DEFENDANT
HEWLETT-PACKARD COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was served via electronic mail to all counsel of record who have consented to electronic service on June 30, 2014 pursuant to L.R. CV-5(c).


*/s/ Sean N. Hsu*
Sean N. Hsu